# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-CA-00961-COA

| | |
|---|---|
| **JOHN TATE CAMPBELL** | **APPELLANT** |

**v.**

| | |
|---|---|
| **HARRISON COUNTY BOARD OF SUPERVISORS, HARRISON COUNTY SAND BEACH AUTHORITY AND HARRISON COUNTY, MISSISSIPPI** | **APPELLEES** |

| | |
|---|---|
| DATE OF JUDGMENT: | 06/26/2017 |
| TRIAL JUDGE: | HON. ROGER T. CLARK |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | OWEN J. BRADLEY |
| ATTORNEYS FOR APPELLEES: | TIM C. HOLLEMAN PATRICK TAYLOR GUILD |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | AFFIRMED - 11/15/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**WILSON, J., FOR THE COURT:**

¶1.     John Tate Campbell was seriously injured when he fell into an open drainage channel while walking on the beach late at night without a flashlight.  The channel, which is sixteen to eighteen feet wide, is on the beach near the Courthouse Road Pier in Gulfport.

¶2.     Campbell sued Harrison County under the Mississippi Tort Claims Act, alleging that the county negligently failed to protect him from and warn him of a dangerous condition. The circuit court granted summary judgment in favor of the county.

¶3.     We hold that the wide drainage channel is an "open and obvious" condition and that

Campbell's own negligence in walking straight into it was the sole proximate cause of his injury. Therefore, we affirm the circuit court's order granting summary judgment.

## FACTS AND PROCEDURAL HISTORY

¶4. In the 1920s, a seawall was constructed south of Highway 90 on the Mississippi Gulf Coast to protect the highway from erosion. Subsequently, beaches south of the seawall disappeared due to the new wave patterns caused by the seawall and erosion. Then, in 1947, a severe hurricane destroyed a considerable part of the highway and seawall. In the early 1950s, sand was pumped in from the Mississippi Sound to create a sand beach south of the seawall to protect the seawall and the highway from future hurricanes.[1]

¶5. Numerous drainage pipes were installed to drain surface water and rainwater from upland areas and the highway through the seawall to the Mississippi Sound. Most of the water drains through underground pipes that run under the sand beach to the Sound. However, there are eleven open drainage channels in areas where underground pipes are insufficient to handle the runoff.[2] The open channels have been on the beaches since the 1950s. Three of the channels are fenced or partially covered; the other eight are not. Post-Hurricane Katrina, in approximately 2008, the beaches were replenished, and pedestrian bridges were built over some of the channels, along with signs that state: "CAUTION[;]

---

[1] This history is also discussed in *United States v. Harrison Cty.*, 399 F.2d 485 (5th Cir. 1968), and *Harrison Cty. v. Guice*, 140 So. 2d 838 (Miss. 1962), *overruled by Miss. State Hwy. Comm'n v. Gilich*, 609 So. 2d 367 (Miss. 1992).

[2] Harrison County states that the Army Corps of Engineers originally constructed these channels and that the State actually owns the man-made sand beach. However, the county acknowledges that it is charged by statute with maintaining the beach for the public, including the drainage channels.

OPEN CHANNEL[;] CROSS AT SEAWALL OR PEDESTRIAN BRIDGE.

¶6.     This case involves the open drainage channel near the Courthouse Road Pier in Gulfport.  This channel is sixteen to eighteen feet wide.  It runs from the seawall across the sand beach to the water of the Mississippi Sound.  It has been there since the early 1950s. One-foot-square concrete "spreader beams" extend across the width of the channel every ten feet or so.  A pedestrian bridge on the beach also crosses the channel.  It appears that the channel is about eight to ten feet deep.  The water level in the channel varies.

¶7.     On August 27, 2014, around 11 p.m., Campbell and his fiancee, Angela Smith, were visiting a friend, Will Bradley, at his house in Gulfport.  Bradley lived near Texas Avenue a few blocks north of Highway 90.  Campbell, Smith, Bradley, and Bradley's date[3] decided to go for a walk on the beach.  No one in the group carried a flashlight or any other source of light.

¶8.     The group walked south from Bradley's house, crossed over Highway 90 and the seawall, and walked onto the beach and down to the water's edge.  At that point, according to Campbell, they "kind of broke up into couples," and "were having just a romantic stroll," "holding hands" and "making out."  Campbell testified that he was wearing some nice shoes, and he noticed that the water was ruining them.  Campbell also "wanted to go use the bathroom," which was close to a nearby parking lot.  Campbell also testified that he was becoming "embarrassed" because he is "a big boy" and was "sweating" and "huffing and puffing" from the walk to the beach.  So, after only a short stroll along the water's edge,

---

[3] This woman was already with Bradley when Campbell and Smith arrived at Bradley's house.  Neither Campbell nor Smith could recall her name.

3

Campbell "let go of [Smith's] hand" and "started walking in front of [her]" away from the water. Smith testified that, over a relatively short distance, Campbell walked far enough ahead of her that Bradley and his date were walking between them. Smith testified that the four of them "were scattered about" as they walked away from the water, so she was unsure whether the others took "the exact same path as [she did]."

¶9. Campbell walked away from the water in a northeasterly direction, toward a parking lot near the pier. Campbell testified that he saw the one-foot-square "spreader beams" that extend across the open drainage channel every teen feet or so. Indeed, he testified that he saw the beams when he was still thirty or forty yards away from the channel. However, Campbell testified that, in the dark, he thought that the concrete spreader beams were actually "parking lot bumpers" in the parking lot. Campbell testified that after he saw the concrete beams from a distance of thirty or forty yards, he "paid no attention to [the beams]" and just continued "walking forward" and "looking forward" until he suddenly fell into the channel. Campbell claimed that he never actually saw the channel before he fell into it. He testified that the channel was not "visible" in the darkness. Smith similarly testified that the beach was dark enough that she could not tell what the channel was until she got down on her knees, crawled up to the channel, and touched it with her hands.

¶10. When Campbell fell into the channel, the water was only knee-deep or waist-deep. Campbell suffered severe compound/open fractures to his left tibia and fibula and other severe injuries to his leg. Campbell was unable to pull himself out of the channel, and Smith and Bradley were also unable to pull him out. Smith eventually climbed into the channel

4

with Campbell to try to help him. A few minutes later an ambulance and the fire department arrived, and they were able to remove Campbell from the channel. Campbell was taken to the hospital. He required extensive treatment and multiple surgeries to repair his leg and to treat infections to his leg.

¶11. In November 2015, having previously filed a notice of claim pursuant to Mississippi Tort Claims Act (MTCA), *see* Miss. Code Ann. § 11-46-11 (Rev. 2012), Campbell filed suit against Harrison County[4] in the Harrison County Circuit Court. The county answered, denied liability, and asserted various defenses, including immunities and exemptions from liability under the MTCA. Following discovery, the county filed a motion for summary judgment, arguing that it was exempt from liability pursuant to Mississippi Code Annotated section 11-46-9(1)(v) (Rev. 2012) and had "committed no act of negligence which proximately caused or contributed to [Campbell's] accident and injuries."

¶12. Following a hearing on the county's motion, the circuit court granted summary judgment in favor of the county. The court held that the exemption in section 11-46-9(1)(v) applied because the drainage channel was an "open and obvious" condition. The court also concluded that Campbell's injuries were attributable to his decision to proceed through an unfamiliar area in the dark. Campbell filed a timely notice of appeal.

**ANALYSIS**

¶13. "We review the grant . . . of a motion for summary judgment de novo, viewing the

---

[4] Campbell's complaint named Harrison County, its board of supervisors, and the Harrison County Sand Beach Authority as defendants. In their answer, the defendants asserted that the board of supervisors and the Sand Beach Authority were not proper defendants. We will refer to the defendants collectively as the county.

5

evidence in the light most favorable to the party against whom the motion has been made."

*Karpinsky v. Am. Nat'l Ins. Co.*, 109 So. 3d 84, 88 (¶9) (Miss. 2013) (quotation marks omitted). The circuit court's rulings on questions of law and statutory interpretation are also reviewed de novo. *City of Jackson v. Harris*, 44 So. 3d 927, 931 (¶19) (Miss. 2010). We will affirm if an order granting summary judgment if the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." M.R.C.P. 56(c); *see Stroud v. Progressive Gulf Ins. Co.*, 239 So. 3d 516, 526 (¶31) (Miss. Ct. App. 2017).

¶14. The MTCA waives "the immunity of the state and its political subdivisions from claims for money damages arising out of the torts of such governmental entities and the torts of their employees while acting within the course and scope of their employment." Miss. Code Ann. § 11-46-5(1) (Rev. 2012). However, the MTCA also provides that a governmental entity "shall not be liable" in a variety of contexts and circumstances. Miss. Code Ann. § 11-46-9(1). As relevant in this case,

> A governmental entity . . . shall not be liable for any claim . . . [a]rising out of an injury caused by a dangerous condition on property of the governmental entity that was not caused by the negligent or other wrongful conduct of an employee of the governmental entity or of which the governmental entity did not have notice, either actual or constructive, and adequate opportunity to protect or warn against; *provided, however, that a governmental entity shall not be liable for the failure to warn of a dangerous condition which is obvious to one exercising due care . . . .*

*Id.* at (v) (emphasis added).

¶15. This Court has recognized that the italicized "provided" clause "is a complete bar in a Tort Claims Act case for the failure to warn of a dangerous condition." *City of Natchez v.*

6

*Jackson*, 941 So. 2d 865, 876 (¶33) (Miss. Ct. App. 2006). Thus, a governmental entity shall not be held liable for the failure to warn of an "open and obvious" condition. *Id.*[5] However, the open-and-obvious defense is not a complete bar to recovery for every premises liability claim against a governmental entity. *Calonkey v. Amory Sch. Dist.*, 163 So. 3d 940, 943 (¶14) (Miss. Ct. App. 2014). Rather, "as the statute clearly states, the fact that a dangerous condition is obvious only exempts the [governmental entity] from liability for the failure to warn of the condition." *Id.* "It is not a bar to recovery when the issue is the government's negligent maintenance or repair which led to the dangerous condition." *City of Natchez*, 941 So. 2d at 876 (¶33); *accord City of Jackson v. Internal Engine Parts Grp. Inc.*, 903 So. 2d 60, 64 (¶11) (Miss. 2005); *Calonkey*, 163 So. 3d at 943 (¶14).

¶16.    The channel in this case is sixteen to eighteen feet wide. Since the 1950s, it has run from the seawall all the way across the sand beach to the water of the Mississippi Sound. One-foot-square concrete "spreader beams" extend across the width of the channel every ten feet or so. In addition, a pedestrian bridge on the beach traverses the channel. The circuit court correctly held that this drainage channel is an open and obvious condition as a matter

---

[5] Neither a governmental entity nor a private landowner has any duty to warn of an open and obvious condition. *Compare City of Natchez*, 941 So. 2d at 876 (¶33) ("While both parties concede that 'open and obvious' is not a complete bar to recovery in this case, we recognize that it is a complete bar in a Tort Claims Act case for the failure to warn of a dangerous condition."), *with Mayfield v. The Hairbender*, 903 So. 2d 733, 736 (¶12) (Miss. 2005) ("[A]n invitee may not recover for failure to warn of an open and obvious danger."), *id.* at 737 (¶20) ("A landowner owes an invitee the duty . . . to warn only where there is hidden danger or peril that is not in plain and open view."), *id.* at 738 (¶21) (holding that the landowner "had no duty to warn of an open and obvious danger"). On this issue, there is no significant difference between the law under the Tort Claims Act and the common law applicable to private landowners.

7

of law. In the language of the statute, "one exercising due care" for his own safety could not fail to notice this channel. Miss. Code Ann. § 11-46-9(1)(v).

¶17. "Just how open and obvious a condition may have been is a question for the jury, in all except the clearest of cases." *Bell v. City of Bay St. Louis*, 467 So. 2d 657, 664 (Miss. 1985). But "[t]he case sub judice is one of those clearest cases." *Fulton v. Robinson Indus. Inc.*, 664 So. 2d 170, 176 (Miss. 1995). In *Fulton*, the Supreme Court held that a snow-covered parking lot was an open and obvious condition. *Id.* In *Howard v. City of Biloxi*, 943 So. 2d 751 (Miss. Ct. App. 2006), this Court held that a ½" to 1½" unevenness in a sidewalk was an open and obvious condition. *Id.* at 753, 756 (¶¶2, 14-15). We did so based on "our review of the photographs presented by [the plaintiff]." *Id.* at 756 (¶15). And in *Mayfield*, the Supreme Court held that uneven pavement that "jutted up" about two inches over a step was an open and obvious condition. *Mayfield*, 903 So. 2d at 734, 736 (¶¶3, 13-14). The sixteen- to eighteen-foot-wide channel in this case, as depicted in multiple photographs submitted by Campbell, is at least as "open and obvious" as the conditions in *Fulton*, *Howard*, and *Mayfield*—which were all deemed open and obvious as a matter of law. Therefore, the county was entitled to summary judgment claim on any failure-to-warn claim. Miss. Code Ann. § 11-46-9(1)(v).

¶18. As discussed above, under both the Tort Claims Act and common law, "the fact that a dangerous condition is obvious only exempts [a governmental entity] from liability for the failure to warn of the condition." *Calonkey*, 163 So. 3d at 943 (¶14). The obviousness of a dangerous condition does not exempt the governmental entity from liability if the plaintiff

8

can show that the condition existed or was not corrected because the governmental entity negligently failed to maintain the premises in a reasonably safe condition. Thus, in most cases like this one, in which the plaintiff alleges that the defendant negligently created or failed to protect invitees[6] from a dangerous condition, "[t]he 'open and obvious' standard is simply a comparative negligence defense used to compare the negligence of the plaintiff to the negligence of the defendant." *Mayfield*, 903 So. 2d at 737 (¶18) (quoting *Tharp v. Bunge Corp.*, 641 So. 2d 20, 24-25 (Miss. 1994)).

¶19.    However, the Supreme Court has also held that "the open and obvious defense [remains] a complete bar to a negligence claim" if "the plaintiff [is] one hundred percent (100%) negligent himself." *Fulton*, 664 So. 2d at 176 (quoting *Tharp*, 641 So. 2d at 23). Of critical importance to this case, "[t]he invitee is still required to use in the interest of his own safety that degree of care and prudence which a person of ordinary intelligence would exercise under the same or similar circumstance." *Id.* at 175; *accord O'Keefe v. Biloxi Casino Corp.*, 76 So. 3d 726, 732 (¶24) (Miss. Ct. App. 2011). This is because "a property owner is not the insurer of an invitee's safety." *Double Quick Inc. v. Moore*, 73 So. 3d 1162, 1166 (¶13) (Miss. 2011). The property owner "owes a duty to an invitee to exercise *reasonable or ordinary* care to keep the premises in a *reasonably safe* condition." *Fulton*, 664 So. 2d at 175 (emphasis added). "[T]he owner 'is not required to keep the premises absolutely safe, or in such a condition that no accident could possibly happen to a

---

[6] During oral argument in this Court, the county asserted that Campbell was a licensee, not an invitee. However, the county did not raise that issue in its motion for summary judgment in the circuit court or in its brief on appeal.

customer.'" *Penny Pinchers v. Outlaw*, 61 So. 3d 245, 249 (¶14) (Miss. Ct. App. 2011) (quoting *Stanley v. Morgan & Lindsey Inc.*, 203 So. 2d 473, 476 (Miss. 1967)).

¶20.    In this case, we can only conclude that the sole proximate cause of Campbell's injury was his own negligence in walking directly into this wide, open, and obvious channel. Campbell claims that the county should have covered the channel or put a fence around it. However, this channel and similar channels have been on the Harrison County beaches since the early 1950s, and there is no evidence that any anyone other than Campbell has ever been injured by any of them. Chuck Loftis, the director of the county sand beach department, testified that he had worked for the county for twenty-seven years and was not aware of any other incident in which someone had been injured by falling into any of the channels.[7] *Cf. Vivians v. Baptist Healthplex*, 234 So. 3d 304, 310 (¶23) (Miss. 2017) (Dickinson, P.J., specially concurring) ("Were there [no similar incidents on allegedly dangerous pool steps], no reasonable jury could conclude that the steps were unreasonably dangerous."). Simply put, Campbell would not have suffered any injured whatsoever if he had been paying attention and exercising minimal care for "his own safety." *Fulton*, 664 So. 2d at 175.

¶21.    In his deposition, Campbell admitted that the channel is open and obvious in the daytime. He claimed, though, that it was not open or obvious when he fell into it after 11

---

[7] Loftis had worked for the sand beach department for twenty-five years and had been its director since 2011. In his deposition, Campbell asserted that someone from "the fire department told [him]" that "a woman fell in the same day [he] did." This was pure hearsay and obviously was not competent summary judgment evidence. *Karpinsky*, 109 So. 3d at 90-92 (¶¶20-24); *see* M.R.C.P. 56(e). Campbell presented no evidence to corroborate his assertion. Nor did he present any evidence of any similar incident in the six-plus decades that the channels have been on the beach.

p.m., when, as one would expect, it was dark on the beach. Campbell also claimed that at the time of his injury the beach was dark enough that he could not see the channel—but, contradictorily, not so dark that it was unsafe for him to walk in an unfamiliar area without a flashlight.

¶22.    As discussed above, Campbell testified that he suddenly walked away from Smith and the water because the water was messing up his shoes, because he wanted to find a bathroom, and because he was embarrassed to be sweating and "huffing and puffing." He testified that when he was still thirty or forty yards away from the channel, he could see the concrete spreader beams that cross the channel, but he thought they were "parking lot bumpers." Campbell claimed that he never actually saw the channel before he fell into it. He testified that the channel was not "visible" in the darkness. Smith similarly testified that the beach was dark enough that she could not tell what the channel was until she got down on her knees and touched it. Campbell testified that after he saw the concrete beams from thirty or forty yards away, he "paid no attention to them" and just continued "walking forward" and "looking forward" until he suddenly fell in.

¶23.    Although Campbell claimed that it was too dark to see the sixteen- to eighteen-foot-wide drainage channel, he also testified that "[i]t wasn't dark enough to where [he] couldn't see." And although it was after 11 p.m. and Campbell had never visited this stretch of the beach before,[8] he asserted that he "didn't need a flashlight." Campbell did admit, though,

---

[8] Campbell had lived on the Mississippi Gulf Coast for a number of years at different times in his life, but he testified that he had never walked on this particular beach or noticed this channel or any of the other open drainage channels on the Mississippi beaches.

that he would not have fallen into the channel if he had been using a flashlight.

¶24. Campbell tried to describe a beach too dark for him to see this open and obvious channel but yet still light enough to excuse his decision to walk in an unfamiliar area late at night without a flashlight. On the undisputed facts of this case, that is not possible. The county is entitled to judgment as a matter of law regardless of exactly how much light there was when Campbell was injured. On one hand, if there was enough light to see the channel, then the channel was so open and obvious that Campbell's own negligence in walking straight into it was the sole proximate cause of his injury. On the other hand, if it was too dark to see this wide channel, then Campbell's own negligence in barreling across unfamiliar terrain late at night and without a flashlight was the sole proximate cause of his injury. *See Selby v. McWilliams Realty Corp.*, 246 Miss. 568, 573, 151 So. 2d 596, 597-98 (1963) (holding that a newspaper deliveryman who fell into an open elevator shaft after entering into a completely dark building at 2:30 a.m. "was not exercising reasonable care for his own safety and his negligence was the sole proximate cause of his injuries"). Either way, Campbell was not using ordinary "prudence and care" for "his own safety." *Fulton*, 664 So. 2d at 175. His own negligence was the sole proximate cause of his own injuries. *Id.* at 176 (citing *Tharp*, 641 So. 2d at 23).

¶25. "Common sense must occasionally prevail and this case absolutely mandates common sense application." *Id.* at 175. The injury in this case, though serious, "belong[s] to a class of ordinary accidents which are properly imputed to the carelessness [and] misfortune of the one injured." *Id.* at 176 (quoting *Mercy Reg'l Med. Ctr. v. Doiron*, 348 So. 2d 243, 246

12

(Miss. 1977)). The circuit court properly granted the county's motion for summary judgment because there is no genuine issue of material fact, and the county is entitled to judgment as a matter of law.

¶26. **AFFIRMED.**

**IRVING AND GRIFFIS, P.JJ., CARLTON AND TINDELL, JJ., CONCUR. LEE, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY BARNES, FAIR, GREENLEE AND WESTBROOKS, JJ.**

**LEE, C.J., DISSENTING:**

¶27. I respectfully dissent. The circuit court incorrectly granted summary judgment to Harrison County on all of Campbell's claims based on its determination that the culvert into which Campbell fell was open and obvious to one exercising due care. The majority likewise finds that this is one of the rare "clearest of cases" where the open-and-obvious nature of a condition may be decided on summary judgment. The majority concludes that the culvert was open and obvious as a matter of law from the size of the culvert alone, barring Campbell's failure-to-warn claim under the Mississippi Tort Claims Act (MTCA). The majority additionally concludes that Campbell was 100% at fault for the accident for not carrying a flashlight, thus barring his remaining negligence claims. But there is no support in the record for either of these findings nor has the circuit court—the fact finder—made any factual findings on the majority's latter conclusion regarding the comparative negligence of the parties.

¶28. Because genuine issues of material fact exist regarding whether the culvert was open and obvious and whether Harrison County bore any responsibility, or comparative fault, for

the accident, this case should be reversed and remanded to the circuit court for further proceedings.

**1.      Genuine issues of material fact exist as to whether the culvert is open and obvious.**

¶29.    Campbell's and Angela Smith's testimonies create a genuine issue of material fact as to whether the culvert was "a dangerous condition which is obvious to one exercising due care . . . ." Miss. Code Ann. § 11-46-9(1)(v) (Rev. 2012). Campbell and Smith testified that around 11 p.m. when Campbell fell into the culvert, the area of the public beach near the culvert was somewhat lit by streetlights in the nearby parking lot and along Highway 90. Campbell and Smith and another couple had walked from a house near the beach and had been walking without issue until Campbell fell into the culvert.

¶30.    Campbell testified that the beach was well lit enough that the four members of the group "didn't need a flashlight." He stated, "it was nighttime, but it wasn't dark enough where I needed a flashlight." Campbell testified that shortly before falling into the culvert, he saw benches, trees, and a fire pit on the beach and one-foot beams he thought were parking-lot bumpers. He could also see cars parked in the nearby parking lot. He then saw a "shadow" that turned out to be the culvert where he fell. Smith testified she was able to see objects on the beach as well, including the benches and fire pit, shortly before reaching the culvert. She did not see the culvert. Like Campbell, Smith was unfamiliar with the area and did not know the culverts existed. Due to the depth of the culvert and the fact that it only contained a shallow amount of water, Campbell suffered extensive injuries when he fell, including a severe open fracture to his lower left leg and a gangrenous infection due to

14

bacteria in the sea water.

¶31. In addition to Campbell's and Smith's testimonies creating doubt as to the obvious nature of the culvert, Chuck Loftis's testimony did as well. Loftis was the director of the Sand Beach Department at the time of Campbell's accident. His testimony was the only evidence Harrison County presented in support of its contention that the culvert was open and obvious. Loftis testified that he was unaware of anyone else falling into one of the culverts and that he thought the culverts were obvious such that it was unnecessary to cover them. But Campbell testified, albeit through hearsay, that he had been told another person fell into a culvert the same day he did. And Loftis's statements that he thought the culverts were obvious and should not be covered are not convincing because his statements always came back to his concern that the covers would create additional maintenance responsibilities for the county. When asked whether all the culverts should be covered, he stated, "I don't think so . . . because we have to maintain them. For maintenance wise, I would not suggest putting it across all of them."

¶32. Further, Loftis's testimony that the culverts are obvious and should not be covered is contradicted by Harrison County's Sand Beach Master Plan, which was introduced into evidence during Loftis's deposition. It states:

> The overall design of the open culverts along the beach steps can be enhanced to make them safer and to fit the desired appearance of the beach. When the open culverts are present, wooden bridges should be provided at intervals to allow pedestrians to cross. This will make crossing the culverts safer. *There are currently no guardrails along the sides of the open flow culverts which poses a safety risk for beach goers.* Guardrails along the open flow culverts and bridges will reduce the risk. . . . *These culverts can be covered or fenced and have bridges added to safely allow pedestrians to cross.*

15

(Emphasis added).

¶33.   Loftis testified that three of the eleven culverts had been either partially covered or fenced.  A culvert in Biloxi had been partially covered by a plastic cover.  A culvert in Long Beach near the Long Beach Pavilion had a fence around it.  And the culvert near the VA Hospital in Gulfport had a wooden barricade between a walkway or pedestrian pathway and the open channel because, according to Loftis, "it's more than a 32-inch drop from here where this open channel is, so [Harrison County has] to have this rail."  It is not explained why a "more than . . . 32-inch drop" required a rail in this instance, but a ten-foot drop into a culvert in another location did not.

¶34.   It is true that Harrison County is not the insurer of public safety at the beach.  Certainly, obviously dangerous conditions exist on public beaches, and inherent risks are taken by beach goers for which the county is not responsible.  However, it has not been established that, objectively speaking, a reasonable person exercising caution who is unfamiliar with the area would find a ten-foot-deep culvert, flush with the ground, open and obvious.  Campbell and Smith certainly did not.  Rather, as Campbell stated, "It's a hole in the middle of a walkway on a very busy beach . . . ."

¶35.   Based on the evidence presented, a genuine issue of material fact remains—like this Court found in *Calonkey v. Amory School District*, 163 So. 3d 940 (Miss. Ct. App. 2014), *cert. denied*, 163 So. 3d 301 (Miss. 2015)—whether the culvert was obvious.  In *Calonkey*, the plaintiff fell through "a giant exposed hole in the middle" of a catwalk ten feet above a stage at a public high school.  *Id.* at 942 (¶6).  The circuit court granted summary judgment

16

in favor of the school district on the basis that the hole was open and obvious. *Id.* at (¶9). This Court reversed and remanded, finding that whether the hole was open and obvious was a question of disputed fact that could not be resolved on summary judgment. *Id.* at 943 (¶15). We found dispositive Calonkey's testimony that "the catwalk was dark and covered with debris." *Id.* And even though "other portions of his testimony suggested otherwise," on summary judgment, the evidence is viewed in the light most favorable to the nonmovant. *Id.*

¶36. Here, the majority finds that the culvert was open and obvious because of its size alone and that Campbell was 100% negligent because it was dark and he was not carrying a flashlight. But the same facts were present in *Calonkey*—the plaintiff fell through "a giant exposed hole" in the dark—and this Court found summary judgment was inappropriate. There is no mention of a flashlight in *Calonkey*.

¶37. Viewing the evidence in the light most favorable to Campbell, the testimony and Sand Beach Master Plan create doubt as to the obvious nature of the culvert. The beach is open to the public both day and night, and visitors are encouraged to come to the beach for recreation and tourism. The culvert is not a natural hazard a person may expect to see at a beach; rather, it is an eight-to-ten-foot deep, manmade open pit flush with the ground.[9] And Harrison County acknowledged the potentially hidden danger posed by the culverts by

_____

[9] *Cf. Blackston v. George County*, 102 So. 3d 1182, 1186-87 (¶¶21-22) (Miss. Ct. App. 2012) (finding the county had no duty to warn of "a mound of dirt" on the side of a road at night where the plaintiff knew dirt work was occurring and the dirt mound was open and obvious). A culvert flush with the ground is distinguishable from a mound of dirt that was visible to anyone driving past.

placing warning signs on each side of the culverts and by partially covering or fencing three of the culverts.

¶38. "Where doubt exists as to whether there is a genuine issue of material fact, the trial judge should err on the side of denying [summary judgment] and permitting a full trial on the merits." *Ellis v. Powe*, 645 So. 2d 947, 950 (Miss. 1994). As doubt exists, the circuit court's grant of summary judgment should be reversed.

## 2. Genuine issues of material fact exist regarding the parties' comparative fault.

¶39. As recognized by the majority, under Mississippi's comparative-negligence law, summary judgment in favor of Harrison County on Campbell's negligence claims is appropriate only if Campbell is determined to be 100% at fault for the accident. *Fulton v. Robinson Indus. Inc.*, 664 So. 2d 170, 176 (Miss. 1995). But "it is the [fact finder]'s responsibility to [determine relative fault and] assess percentages of fault between two parties." *McLaughlin v. N. Drew Freight Inc.*, 249 So. 3d 1081, 1085 (¶14) (Miss. Ct. App. 2018).

¶40. The circuit court made no findings on fault because it found the suit barred under the MTCA's open-and-obvious defense. In so finding, the circuit court incorrectly stated that "[t]he 'open and obvious' defense" in section 11-46-9(1)(v) is "a *complete bar* to recovery in suits involving governmental entities and gives said entities complete protection from liability." (Emphasis added). Section 11-46-9(1)(v) clearly states that an obviously dangerous condition "*only* exempts [a governmental entity] from liability for the *failure to warn* of the condition." *Calonkey*, 163 So. 3d at 943 (¶14) (emphasis added). "It does not

18

exempt [a governmental entity] from liability for causing the dangerous condition through the negligent or willful actions of its employees" or for negligence in "constructing and maintaining" the dangerous condition. *Id.*

¶41. Campbell alleged claims in his complaint regarding Harrison County's failure to "maintain, inspect, repair and remedy the dangerous condition"; failure to cover the culverts or erect fences or other structures to prevent falls into the culverts; and failure to provide adequate lighting around the culvert and safety equipment in or near the culvert to assist a person out of the culvert.[10] These claims have not been addressed by the circuit court because the circuit court simply found Campbell's suit was barred by the MTCA. Thus, the determination of fault is not appropriate for this Court's review. *See Olier v. Bailey*, 164 So. 3d 982, 995 (¶44) (Miss. 2015) ("Several questions are left unanswered regarding the relative fault of the two parties, but those are not for our decision. Only a trial can settle those questions.").

¶42. Because questions of material fact exist regarding the open and obvious nature of the culvert and no determination has been made as to the parties' comparative fault, summary judgment was improperly granted. This matter should be reversed and remanded to the circuit court for further proceedings.

**BARNES, FAIR, GREENLEE AND WESTBROOKS, JJ., JOIN THIS**

---

[10] Campbell remained in the culvert until an ambulance arrived. He was unable to climb the sheer ten-foot side of the culvert to get out, and his friends were unable to pull him out. Campbell argues the time spent in the culvert's shallow, stagnant water resulted in a gangrenous infection in his leg from the bacteria in the water. No factual determination has been made regarding whether Harrison County bore any responsibility for not providing an escape from the culvert or any other of these claims.

**OPINION.**